**UNITED STATES of America,**
**Plaintiff,**

v.

**Robert Owen McDONNELL, also known**
**as Joe Mack, Defendant.**

**Cr. No. 01482.**

United States District Court,
D. Nebraska.

July 20, 1970.

J. William Gallup, Asst. U. S. Atty., for plaintiff.

Earl J. Witthoff, Lincoln, Neb., for defendant.

MEMORANDUM OPINION ON MOTION FOR SUPPRESSION OF EVIDENCE AND MOTION FOR RETURN OF SEIZED PROPERTY

URBOM, District Judge.

The defendant is charged in two counts with entry and attempt at entry of the Bank of Brady, Brady, Nebraska, the deposits of which were insured by the Federal Deposit Insurance Corporation. He has filed a motion to suppress as evidence certain physical objects, most of which were discovered in an automobile as a result of a search warrant, and has filed a motion for the return to him of such objects. The facts developed at the hearing on the motions are as follows:

Sometime during the early morning hours of May 22, 1969, James Ward, the Sheriff of Cherry County, Nebraska, received by telephone from the Valentine, Nebraska, Police Department word that three subjects were being held by the Deputy Sheriff at Merriman, Nebraska, after being arrested inside the Rhoades IGA Store in Merriman. The sheriff proceeded to Merriman, a small rural village, and saw at the local jail three persons, one of whom was the defendant, who then was using the name of Joe Mack. The sheriff then conducted an investigation in Merriman and found within the hour after the defendant's arrest an unlocked white 1968 Plymouth automobile bearing an Idaho license plate parked inside "the old Merriman Lumber Co." The lumber yard was a building which had been left standing and evidently was not being used for business purposes, other than for storage, and was located across the highway and less than a block from where the defendant was arrested. He then went again to the village jail in Merriman and, after being informed by a deputy sheriff that "a quick search, or a search of" the defendant had been made, the sheriff looked through the bars of the jail and "observed some markings around the walls and the ceiling and window area." He then searched the defendant and found a set of keys in the defendant's pocket, which the sheriff tried in the door locks of the Plymouth automobile and found that they worked to lock and unlock the doors of the car. He did not search the vehicle at that time, but disabled it, tied the steering wheel with a tow rope for towing purposes, locked it, had a wrecker from Valentine tow the car to Valentine and place it behind the court house in the parking lot in Valentine, where it was unlocked, the rope removed and then the car again locked. This towing occurred at probably 4:00 or 5:00 a.m. on May 22. The defendant and the two other persons who had been in the village jail in Merriman were taken to the county jail in Valentine. At about 7:30 a.m. on the same day the sheriff was notified by a telephone call from Keith Quick, owner and operator of the Valentine Machine Shop, that between 6:00 p.m. on May 21 and 7:30 a.m. on May 22 persons unknown had pried a large door at his shop and had removed property from it. The sheriff then went to the Valentine Machine Shop, conducted an investigation, and was informed by Keith Quick that two oxygen bottles and possibly three, together with hose and heating tips, were missing. The sheriff at the Valentine Machine Shop observed tire marks showing that a vehicle had backed up to the door that had been pried. Near the tire tracks and at the opening of the door he also noticed footprints. He took pictures and measurements of the tracks and footprints and "observed that these compared with tire prints and shoe

prints of the three subjects arrested and held in the County Jail." He again viewed the car and saw that it appeared to be "quite heavily loaded in the trunk area." Thereafter on the same day he secured a search warrant, based upon his affidavit,[1] from Harold D. Jordan, County Judge of Cherry County, Nebraska, upon a finding by the county judge of probable cause to believe that there was property which was stolen within Cherry County in the automobile and that there was probable cause to believe that there was property which had been used as a means of committing a criminal offense within the state of Nebraska and authorizing a search for the purpose of discovering and seizing "burglary tools, three oxygen tanks with two 75′ hoses and a Smith gauge and a Marquette gauge, sweepings and debris from the Valentine Machine and Welding Works located in Valentine, Nebraska."

The photographs of the shoes being worn by the defendant on May 21 at Merriman at the time of the arrest, of the footprints near the Valentine Machine Shop on May 22, of treads of a tire on the Plymouth automobile, and of tire tracks near the Valentine Machine Shop on May 22 were placed in evidence at the hearing.

Search of the automobile following issuance of the search warrant revealed three oxygen bottles, two Smith regulators and gauges with hoses of lengths not shown by the evidence, a vacuum cleaner bag containing sweepings and debris, and numerous other items.

Although the affidavit of the defendant asserts that between 10:00 a.m. and noon on May 22 "items from the aforementioned vehicle," which are otherwise unidentified, were spread about the floor of the sheriff's office, thereby indicating that a search of the automobile had taken place before issuance of the search warrant, the court finds that no search involving any of the items covered by

---

1. The affidavit is as follows:

"James M. Ward being first duly sworn upon oath deposes and says that he is the duly elected, qualified and acting Sheriff of Cherry County, Nebraska;

"That on May 22, 1969 I received a 'phone call from the Valentine Police Department Radio Dispatcher advising that three subjects were being held by the Deputy Sheriff at Merriman after being arrested inside the Rhoades I.G.A. Store. Arriving at Merriman I observed the three subjects held and conducted an investigation of the crime scene and the entire area. During this investigation an unlocked white 1968 Plymouth bearing Idaho license plates T2—22443 was observed parked inside the old Merriman Lumber Co. A visual examination was conducted by me of the vehicle with no search being made of the contents of this vehicle. I disabled the vehicle and returned to the local jail. From the person of a man identifying himself as Joe Mack I removed a set of car keys belonging to a Chrysler product vehicle. Returning to the lumber yard I determined that the above keys belonged to the 1968 Plymouth by trying the keys in the door lock. I called the Valentine Police Department and ordered a wrecker sent to tow the vehicle to the Sheriff's Office at Valentine.

I then upon arrival of the wrecker locked the vehicle and had it towed to the Sheriff's office parking lot where the vehicle was impounded and the subjects were placed in the County Jail.

"At 7:30 A.M., on the same date I received a 'phone call from Keith Quick, owner and operator of the Valentine Machine Shop advising that between the hours of 6:00 P.M., May 21, 1969 and 7:30 A.M., May 22, 1969, persons unknown had pryed a large door at his shop and removed property from it. I arrived at the scene and conducted an investigation. I was advised by Quick that two (2) oxygen bottles, possibly three (3) along with hose and heating tips were missing. At the scene I observed tire tracks showing a vehicle had backed up to the door that was pryed. Near these tire tracks and at the opening of the door I also observed foot prints. Taking pictures and measurements of the tracks and prints I observed that these compared with tire prints and shoe prints of the three subjects arrested and held in the County Jail. Also upon again viewing the car impounded at the Sheriff's office I observed that this vehicle appeared to be quite heavily loaded in the trunk area."

the motions has been shown to have occurred before issuance of the warrant. This is compelled by the total failure of the evidence to specify any item claimed to have been in the sheriff's office.

The Fourth Amendment of the Constitution of the United States provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Five issues appear with respect to both motions: (1) whether the search of the person of the defendant by the sheriff at the Merriman jail was unreasonable, (2) whether the defendant has standing to object to the seizure and search of the automobile, (3) whether the warrantless seizure of the automobile by the sheriff preceding the issuance of the warrant was unreasonable, (4) whether the warrant for search of the automobile was issued upon probable cause, and (5) whether items not described in the warrant must be suppressed and delivered to the defendant.

## I. THE SEARCH OF THE DEFENDANT'S PERSON

Nothing appears to have been improper in the making of a search by the sheriff at the Merriman jail. No contention is made that the arrest had not been lawful. Although some kind of search had been at the time of the arrest, which was at most within a few hours before the search by the sheriff, the Constitution prohibits only unreasonable searches. The sheriff himself had not previously made a search and he immediately before his search observed "some markings around the walls, ceiling and window area" of the cell occupied by the defendant. Shortly after the search the accused was transported to Valentine for detention. A reasonable basis for searching a person in custody exists whenever there is reason to believe that he may have anything which may be used as a weapon. The presence of markings on the walls, ceilings and window area, otherwise unexplained, gives reason to believe that some weapon is in the occupant's possession. Additionally, protective searches must be allowed whenever an inmate is about to be transported from one building to another, even without reason to suspect the presence of a weapon within the broad principle of such cases as Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Sibron v. New York, 392 U.S. 40, 66, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925); and Baskerville v. United States, 227 F. 2d 454 (C.A. 10th Cir. 1955).

## II. STANDING TO OBJECT

The Supreme Court of the United States in Jones v. United States, 362 U. S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) swept away a line of decisions of lower courts to the effect that one could not object to an unlawful search and seizure unless he had a proprietary interest in the premises searched amounting to "ownership in or right to possession of the premises," the interest of a "lessee or licensee," or "dominion." The court in the *Jones* case said:

"* * * We do not lightly depart from this course of decisions by the lower courts. We are persuaded, however, that it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. * * *

"* * * No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a

search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him. This would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched. As petitioner's testimony established Evans' consent to his presence in the apartment, he was entitled to have the merits of his motion to suppress adjudicated."

Whether *Jones* sets the perimetrical boundaries of the issue of standing cannot presently be determined. In a more recent case, Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the Supreme Court agreed with the Court of Appeals of the Eighth Circuit that the accused had standing to raise his Fourth Amendment claim. There the only known connection between the defendant and the apartment searched arose from the F.B.I. agents' seeing him enter and leave it and taking from him a key to it which provided the agents' means of entry.

The Court of Appeals for the Ninth Circuit has reasoned that even one whose possession of an automobile is wrongful is entitled to protection against unreasonable searches and seizures of that automobile against all who do not have a paramount right to possession and, therefore, that when an officer at the time of the search knows, irrespective of what he suspects, only that the possessor claims the vehicle to be his, the possessor has standing to claim that the search was not constitutional. Cotton v. United States, 371 F.2d 385 (C.A. 9th Cir. 1967).

 In the case at bar the defendant's connection with the automobile is slightly less than either the *Jones* case or the *Spinelli* case. Here all that is known to connect the defendant with the automobile is that the automobile, bearing an out-of-state license plate, was in an old lumber yard of a small town and that the defendant, then already jailed in that town, had keys to it. Is this sufficient to constitute standing to contest the search and seizure of the automobile? I think so. If the facts are sufficient to give the government a theory upon which to use the contents of the car against the defendant, they are so because they carry some indicia of possession; if they do, such indicia also give standing to object. This is the sensible resolution of the dilemma posed by Judge Learned Hand in Connolly v. Medalie, 2 Cir., 58 F.2d 629, 630:

> "Men may wince at admitting that they were the owners, or in possession, of contraband property; may wish at once to secure the remedies of a possessor, and avoid the perils of the part; but equivocation will not serve. If they come as victims, they must take on that role, with enough detail to cast them without question. The petitioners at bar shrank from that predicament; but they were obliged to choose one horn of the dilemma."

The Supreme Court in Jones v. United States, supra, turned the dilemma inside out by saying:

> "Judge Hand's dilemma is not inescapable. It presupposes requirements of 'standing' which we do not find compelling. Two separate lines of thought effectively sustain defendant's standing in this case. (1) The same element in this prosecution which has caused a dilemma, *i. e.*, that possession both convicts and confers standing, eliminates any necessity for a preliminary showing of an interest in the premises searched or the property seized, which ordinarily is required when standing is challenged.
> * * *
> "As to the first ground, we are persuaded by this consideration: to hold to the contrary, that is, to hold that petitioner's failure to acknowledge interest in the narcotics or the premises prevented his attack upon the search, would be to permit the Government to have the advantage of contradictory positions as a basis for conviction. Petitioner's conviction flows from his

possession of the narcotics at the time of the search. Yet the fruits of that search, upon which the conviction depends, were admitted into evidence on the ground that the petitioner did not have possession of the narcotics at that time. The prosecution here thus subjected the defendant to the penalties meted out to one in lawless possession while refusing him the remedies designed for one in that situation. It is not consonant with the amenities, to put it mildly, of the administration of criminal justice to sanction such squarely contradictory assertions of power by the Government. * * *"

Accordingly, the issue may really be, who carries the onus of the dilemma—the accused or the government? *Jones* puts the onus on the government, where it belongs. Otherwise, the defendant would be compelled to give evidence against himself on the issue of guilt in order to prove his standing. The Court of Appeals for the Eighth Circuit in Spinelli v. United States, 382 F.2d 871 (C.A. 8th Cir.1967) has pointed in that direction by saying:

> "* * * If the defendant is legally occupying, or has been granted a right to occupy the premises, even though he is not physically present at the time of the search, then his privacy has been invaded by a search of these premises. As a person so aggrieved by the search he has a right to object, and to do so he need not allege his specific proprietary interest, i.e., owner, lessee, business invitee, etc. Nor is he required to take the stand to establish his particular interest."

■ This is not to say that any evidence pointing to the guilt of a defendant thereby provides him standing to resist the introduction of it because of an unconstitutional search or seizure. One has no standing to object unless the invasion was of *his* privacy. The search or seizure must have been directed at him and if it was not, the fruits are admissible against him, however improper the search and seizure may have been as to the one against whom it was directed. Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Here, the seizure of the automobile before issuance of the warrant and the search pursuant to the warrant were directed at the defendant. There is no reasonable inference that either the initial seizure or the subsequent search was made for any reason other than the connecting link between the defendant and the car, the set of keys.

Although there is a hint in the testimony adduced at the hearing that the car may have been considered by the sheriff to have been abandoned, that cannot be considered a reasonable conclusion under all the circumstances. By the time of the initial seizure the sheriff had taken from the defendant a set of keys for the automobile. Nothing appears in the evidence from which any reasonable assumption could be made that the car had been abandoned.

In most instances of search and seizure the standing issue pivots upon the relationship between the defendant and certain real estate—that is, the place of the search or seizure. When the object is seized and searched for its contents, however, the critical relationship is that of the defendant to the object. The container becomes the place. Here, then, as to any search *for* the automobile, standing depends upon the defendant's relationship to the real estate; as to the seizure or search *of* the automobile, standing depends upon the defendant's relationship to the automobile. I do not reach the question of the defendant's standing to challenge a search *for* the automobile, because the record is insufficient to show that there was such a search, as is developed more fully in the next section of this opinion.

The defendant has standing to challenge the method of seizure and search of the automobile.

## III. WARRANTLESS SEIZURE OF THE AUTOMOBILE

Upon discovery that the keys possessed by the defendant fit the doors of the automobile, the sheriff disabled the car and had it towed to Valentine, some 60 miles away. The car had been found across the street and within a block of the store in which the arrest occurred.

 As an incident to a lawful arrest, a law enforcement officer properly may search for and seize weapons or evidentiary items on the arrestee's person or in "the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). If the automobile seized by the sheriff had been concealed in a building not in the immediate presence of the defendant but on premises where the defendant had a right or permission to be, it is clear from the *Chimel* case that no search for the automobile and seizure of it would have been justified without a prerequisite warrant. The automobile, however, was on private property in which the defendant is not shown to have had any interest, however slight. Furthermore, the record is insufficient to establish that a "search" was made for the automobile. Whether the car, though apparently inside a building, was concealed or, on the other hand, obvious to anyone in the vicinity because of open doors, windows, or otherwise, is not shown. Accordingly, the taking of the automobile must be treated as a "seizure", rather than as a "search" within the meaning of the Constitution. Pendleton v. Nelson, 404 F.2d 1074 (C.A. 9th Cir. 1968).[2]

 The framers of the Constitution declared a protection from unreasonable seizures, as well as from unreasonable searches. Conceivably, the standards for reasonableness of a search may differ from those of a seizure. From the opinion of the court in Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L. Ed.2d 419 (1970) the language:

"For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment."

may suggest that seizures and searches bear no constitutional distinction. The last sentence, however, leaves room for distinction. Either a warrantless search or a warrantless seizure pending issuance of a warrant stands solidly *if probable cause is present*. The opinion does not purport to deal with searches or seizures absent reasonable cause. If reasonable cause does not exist, no search is justified. If reasonable cause does not exist, will some circumstances justify a seizure?

United States v. Van Leeuwen, 397 U. S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970) answers in the affirmative. In that case two packages in the mails were detained for 29 hours on the basis of "suspicion" while an investigation was made, and, when the investigation revealed probable cause, a search warrant was obtained as swiftly as possible. The court said:

"The nature and weight of the packages, the fictitious return address, and the British Columbia license plates of respondent who made the mailings in this border town certainly justified detention, without a warrant, while an investigation was made. * * * The only thing done here on the basis of suspicion was detention of the packages. There was at that point no possible invasion of the right 'to be secure' in the 'persons, houses,

---

2. Following a car into the defendant's open garage and searching the car without a warrant does not constitute a search of the garage. Scher v. United States, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151 (1938).

papers and effects' protected by the Fourth Amendment against 'unreasonable searches and seizures.' * * * Detention for 1½ hours * * * for an investigation certainly was not excessive; and at the end of that time probable cause existed for believing that the California package was part of an illicit project. A warrant could have been obtained that day for the one package; yet the mystery of the other package remained unsolved and federal officials in Tennessee could not be reached * * *. The next morning they were reached and it was learned that the second package was also probably part of an illicit project. By 4 p. m.—or 26½ hours after the mailing in Mt. Vernon—a search warrant was obtained in Seattle and at 6:30 p. m., or 29 hours after the mailing, the search warrant reached Mt. Vernon, a speedy transmission * * *.

" * * * The significant Fourth Amendment interest was in the privacy of this first-class mail; and that privacy was not disturbed or invaded until the approval of the magistrate was obtained."

■ So, in the case at bar, the seizure of the automobile occurred under suspicious circumstances, although not sufficient, probably, to have justified a search of the automobile. The presence of a car bearing an out-of-state license in a small town, the car's being in an old lumber yard building, the defendant's having been arrested for entering a local store, and the defendant's having keys to the vehicle entitled the sheriff to hold it a reasonable length of time for the making of an investigation. The mobility of the car at that point was akin to the mobility of the packages in *Van Leeuwen*, because the sheriff had no way of knowing whether an accomplice would drive the car away if it were not seized.

The investigation proceeded apace and by 4:00 p. m. of the same day a search warrant had been obtained, the search had been completed and Keith Quick, owner of the Valentine Machine Shop, had been asked to identify the items found in the automobile. Such detention of the automobile for no more than perhaps 16 hours seems no less reasonable under the circumstances than the detention of the packages in *Van Leeuwen*.

·The court concludes that the initial seizure of the automobile affords no basis for suppressing evidence found in the later search.

IV. SEARCH OF THE AUTOMOBILE

■ A search of an automobile properly may be made (1) as an incident to a lawful arrest, or (2) without a warrant, even if not incident to a lawful arrest, if at the time of the search there is probable cause to believe that the automobile contains instrumentalities or fruits of a crime, or (3) in consequence of a search warrant issued upon probable cause. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

■ This search cannot be sustained as an incident to a lawful arrest for two reasons: First, the search was directed at instrumentalities and fruits of the Valentine offense, not the offense for which the defendant was under arrest. Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964). Second, the automobile prior to the search had been transported to Valentine, 60 miles from the arrest scene. "Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest." Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419' (1970), quoting Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964) and citing Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968).

■ Neither can the search be justified upon the basis that a warrantless search would have been proper and that therefore a search under a warrant, however wrongly or defectively issued,

was permissible.[3] It does seem inconceivable that, if a warrantless search would have been proper, a search with a warrant, however improvidently granted, would be unreasonable. Warrantless searches of automobiles are approved, but they find their validity in the existence of probable cause and the exigencies of the moment arising from the mobility of the vehicle. Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L. Ed.2d 777 (1964); Chimel v. California, 395 U.S. 752, 764 n. 9, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). "Carroll, supra,[4] holds a search warrant unnecessary where there is probable cause to search an automobile stopped on the highway; the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained. Hence, an immediate search is constitutionally permissible." Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

 The fact that the automobile had been moved to a different place would not necessarily eliminate the propriety of a search without a warrant. Probable cause may continue to exist and the mobility of the automobile may make even a warrantless search proper, according to the *Chambers* case. In the present case, however, mobility of the car can hardly be said to have been a viable factor. The car had been disabled by the sheriff, he had possession of the keys, it was in a place under his control, and the car was locked. Accordingly, a warrantless search would not have been merited, and issuance of a warrant based upon probable cause became necessary.[5]

 In determining whether probable cause existed for the issuance of the search warrant, no evidence beyond the affidavit upon which it was issued may be considered, because it contained the only facts apparently brought to the attention of the county judge who issued the warrant. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958); Wangrow v. United States, 399 F.2d 106 (C.A. 8th Cir. 1968), cert. denied 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270. Possibly, the one exception is that other evidence may be considered which tends to discredit or impeach the assertions of the affidavit. United States v. Roth, 391 F.2d 507 (C.A. 7th Cir. 1967).

The affidavit of the sheriff stated that the sheriff had found the automobile in Merriman, had located in the defendant's pocket the keys which fit the car after he was in jail for entering a grocery store, that he was informed by the owner and operator of the Valentine Machine Shop that a large door at his shop had been pried and specified property had been removed from the shop, that at the scene of the machine shop the sheriff observed tire tracks "showing that a vehicle had backed up to the door" that was pried and that footprints

---

3. The significance of exploring this possibility arises from the fact that a reviewing court, when determining the validity of a warrant, is limited to the evidence submitted to the official issuing the warrant, which in this case is only the affidavit of the sheriff, whereas, considering the propriety of a warrantless search, it may consider evidence of all facts known to the officer making the search. "The right to search and the validity of the seizure * * * are dependent on the reasonable cause the seizing officer has for belief that the contents of the car offend against the law." Carroll v. United States, 267 U.S. 132, 158, 45 S.Ct. 280, 287, 69 L.Ed. 543 (1925).

4. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

5. See Preston v. United States, 376 U.S. 364, 368, 84 S.Ct. 881, 884, 11 L.Ed.2d 777 (1964):
"Nor, since the men were under arrest at the police station and the car was in police custody at a garage, was there any danger that the car would be moved out of the locality or jurisdiction." The court, it should be noted, was dealing with the question of whether the search was incident to arrest.

were near the tire tracks and at the opening of the door, that he took pictures and measurements of the tracks and prints and observed "that these compared with tire tracks and shoe prints of the three subjects arrested and held in the County Jail," and that upon again viewing the car impounded, he observed that the vehicle "appeared to be heavily loaded in the trunk area."

The rule for interpreting such affidavits is set out in United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L. Ed.2d 684 (1965):

" * * * A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

"This is not to say that probable cause can be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the 'underlying circumstances' upon which that belief is based. See Aguilar v. Texas, supra. Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."

The *Carroll* case held that a search of an automobile for illegal liquors was justified without a warrant at the place where the arrest occurred, under these circumstances:

"We know in this way that Grand Rapids is about 152 miles from Detroit and that Detroit and its neighborhood along the Detroit River, which is the International Boundary, is one of the most active centers for introducing illegally into this country spirituous liquors for distribution into the interior. It is obvious from the evidence that the prohibition agents were engaged in a regular patrol along the important highways from Detroit to Grand Rapids to stop and seize liquor carried in automobiles. They knew or had convincing evidence to make them believe that the Carroll boys, as they called them, were so-called 'bootleggers' in Grand Rapids, i. e., that they were engaged in plying the unlawful trade of selling such liquor in that city. The officers had soon after noted their going from Grand Rapids half way to Detroit and attempted to follow them to that city to see where they went, but they escaped observation. Two months later these officers suddenly met the same men on their way westward presumably from Detroit. The partners in the original combination to sell liquor in Grand Rapids were together in the same automobile they had been in the night when they tried to furnish the whisky to the officers which was thus identified as part of the firm equipment. They were coming from the direction of the great source of supply for their stock to Grand Rapids where they plied their trade. That the officers when they saw the defendants believed that they were carrying liquor we can have no doubt, and we think it is equally clear that they had reasonable cause for thinking so. Emphasis is put by defendants' counsel on the statement made by one of the officers that they were not looking for defendants at the particular time when they appeared. We do not perceive that it has any weight. As soon as they did appear, the officers were entitled to

use their reasoning faculties upon all the facts of which they had previous knowledge in respect to the defendants."

On the other hand, the court in the *Preston* case held invalid a search of an automobile which had been removed from the place of arrest and taken by the police to a garage, under these circumstances:

"The police of Newport, Kentucky, received a telephone complaint at 3 o'clock one morning that 'three suspicious men acting suspiciously' had been seated in a motorcar parked in a business district since 10 o'clock the evening before. Four policemen straightaway went to the place where the car was parked and found petitioner and two companions. The officers asked the three men why they were parked there, but the men gave answers which the officers testified were unsatisfactory and evasive. All three men admitted that they were unemployed; all of them together had only 25 cents. One of the men said that he had bought the car the day before (which later turned out to be true), but he could not produce any title. They said that their reason for being there was to meet a truck driver who would pass through Newport that night, but they could not identify the company he worked for, could not say what his truck looked like, and did not know what time he would arrive. The officers arrested the three men for vagrancy, searched them for weapons, and took them to police headquarters."

■ An affidavit in support of a warrant needs to show sufficient facts to enable the official issuing the warrant reasonably to infer that the information in the affidavit and the source of the information are reasonably relia-

ble. See Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

This case differs factually from *Aguilar* and *Spinelli*, where the reliability of an informer was the paramount issue. Here the reliability of the owner and operator of the machine shop which had evidently been burglarized can scarcely be questioned. The real issue, therefore, is the reliability of the information itself, as to (1) the connection between the defendant and the crime committed in Valentine at the machine shop, for which the warrant was issued, and (2) the sufficiency of the facts to indicate the probability that within the car were instrumentalities or fruits of that crime. The first rests ultimately upon the strength of the sheriff's conclusion that the footprints and tire marks "compared with" the shoes and the tires.[6] The second rests, finally, upon the sheriff's saying that the car appeared to be heavily loaded in the trunk area.

■ These conclusions, while they are conclusions, are not ones which an experienced investigative officer, as the sheriff was, could not reasonably form. A comparison of objects and prints of the objects is a matter which can be made with some measure of reliability, although it is entirely possible that expert analysis by more scientific means would be necessary to permit introduction in evidence at a trial for the purpose of suggesting that the marks were made by the objects. Affidavits of probable cause are tested by a much less rigorous standard than those governing admissibility of evidence. McCray v. Illinois, 386 U.S. 300, 311, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Indeed, the test is

6. In view of the entire circumstances, the affidavit's assertion that the tire prints and footprints "compared with tire prints and shoe prints of the three subjects arrested" reasonably meant that the tire prints observed at the scene of the offense at Valentine were similar to the treads of the tire or tires of the Plymouth automobile described and that the footprints seen at the scene in Valentine were similar to the soles of the shoes taken from the defendant and his companions in Valentine.

that only the *probability*, not a prima facie showing, is the standard of probable cause. Beck v. Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). Automobiles that appear to be heavily loaded are seen frequently enough to permit most people to be able to express a fairly reliable conclusion on the subject. The nature of the conclusions of the sheriff is not more illusory or the conclusions themselves more suspect than an investigator's conclusion that he smelled the odor of "mash" which has been held to be a proper basis for issuance of a warrant in United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) and Monnette v. United States, 299 F.2d 847 (C.A. 5th Cir. 1962).

■ The affidavit here is more than one which is "purely conclusory," as was condemned in United States v. Ventresca, supra. It details the underlying circumstances sufficiently to permit the county judge to perform his detached function. Although this may be a doubtful or marginal case, "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." United States v. Ventresca, supra; Jones v. United States, 362 U.S. 257, 270, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

■ In the case at bar a fair and realistic interpretation of the affidavit sustains the county judge's finding of reasonable cause. The showing is fully as strong as that in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L. Ed. 543 (1925) and considerably stronger than in Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964).

## V. SEIZURE OF ITEMS UNDER THE WARRANT

■ The warrant set out, as items to be seized, "burglary tools, three oxygen tanks with two 75′ hoses and a Smith gauge and a Marquette gauge, sweepings and debris from the Valentine Machine and Welding Works located in Valentine, Nebraska." Was the description too broad to meet the Fourth Amendment mandate that a warrant must "particularly" describe the "things to be seized"? It was not too broad. Admittedly, the term "burglary tools" is broad and, arguably, if no other description had been given, the warrant might have been invalid in light of Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965), wherein the warrant described only "books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas." But in the case now before this court the warrant also directed itself to items described with particularity, namely, oxygen tanks with 75′ hoses and a Smith gauge and a Marquette gauge, and sweepings and debris from a specific shop. These specifications alone made the warrant valid. Additionally, as long as the possession of burglar's tools is a crime,[7] it would seem inconsistent to hold that "burglar's tools" or a similar description is specific enough to stand as an identifiable crime but not specific enough to permit seizure of "burglary tools" under a warrant bearing that description. This court is not prepared to say that either description is too general for either purpose. Perhaps a description as specific as possible under the circumstances [8] is sufficient to permit seizure of those objects readily identifiable as being adaptable to a burglar's trade.

7. See Sanders v. United States, 238 F.2d 145 (C.A. 10th Cir. 1956); Schutz v. United States, 395 F.2d 225 (C.A. 10th Cir. 1968). One statute has been held unconstitutional, not because of generality of wording, but because it placed on the defendant the burden of proof. Benton v. United States, 98 U.S.App.D.C. 84, 232 F.2d 341 (1956).

8. United States v. Robinson, 287 F.Supp. 245 (U.S.D.C.N.D.Ind.1968).

Whether the officer rightly could seize things not clearly described or clearly not described in the warrant is a separate question needing independent analysis.

The charges now against the defendant, bank entry and attempted entry, are different from the one for which the warrant was issued, burglary of a machine shop.

Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927) declares flatly:

"The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and *prevents the seizure of one thing under a warrant describing another*. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." (Emphasis added.)

That case denied that seizure of a ledger and bills of an illicit liquor manufacturing business was justified under a warrant describing "intoxicating liquors and articles for their manufacture." It is significant, however, that the court upheld the seizure as being an *incident to a lawful arrest without a warrant*, saying:

"The officers were authorized to arrest for crime being committed in their presence, and they lawfully arrested Birdsall. They had a right without a warrant contemporaneously to search the place in order to find and seize the things used to carry on the criminal enterprise * * * And, while [the ledger] was not on Birdsall's person * * * it was in his immediate possession and control * * * The bills * * * were so closely related to the business, it is not unreasonable to consider them as used to carry it on. It follows that the ledger and bills were lawfully seized as an incident to the arrest."

Even without an arrest, warrantless seizures are proper in some tightly-drawn circumstances. For example, "hot pursuit" of a suspect may authorize officers to search a dwelling for the suspect and contemporaneously to seek and seize the fruits and means of committing the crime, weapons, and even "mere evidence" of the identification of the suspect. Warden Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S. Ct. 1642, 18 L.Ed.2d 782 (1967).

An officer should not be more restricted in a search which he has instituted pursuant to a search warrant than in one lawfully undertaken without a search warrant. Otherwise, the preference to be given to the warrant procedure would be sabotaged. United States v. Robinson, 287 F.Supp. 245 (U.S.D.C. N.D.Ind.1968).

Relying upon Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), which permitted seizure of property related to a different crime from that for which a lawful search had been undertaken without a search warrant, the courts deciding Aron v. United States, 382 F.2d 965 (C.A. 8th Cir. 1967) and United States v. Eisner, 297 F.2d 595 (C.A. 6th Cir. 1962) have held that, even where no arrest has been or is being made, officers searching under a valid search warrant may seize property not described in the warrant and relating to a different offense, where possession of that property constitutes a crime. The possession, said the courts, meant that the possessor was committing an offense in the presence of the officers.

*Aron* and *Eisner*, then, take one step beyond *Marron*. Whereas *Marron* says that officers are authorized to arrest for a crime being committed in their presence and to seize evidence of that criminal enterprise, *Aron* and *Eisner* say that officers may seize evidence of a crime being committed in their presence without a contemporaneous arrest, where the entry was proper because of a search warrant related to a different offense.

This conclusion appears to be justified by *Harris.*[9]

■ It is sensible that, given a lawful entry, if an officer sees in plain sight evidence not described in the warrant, he should be permitted to seize it if he does not thereby expand the scope of the entry and search. To require the officer to abandon or complete the search, get another warrant on the strength of what he saw while making the search, and then return before seizing the property would be sacrificing substance for form, where instant connection between the newly seen evidence and the crime can be made.

If the newly seen objects obviously relate to a different crime, the solution should be the same.

■ With respect to items of property seized but not particularly described in the warrant, the rule now adopted by this court is: An officer may seize any property which is evidence of a crime, whether or not different from the crime by which the search was prompted, if: (1) the evidence is discovered in the course of a lawful search, whether initiated by a valid search warrant, a valid arrest warrant, circumstances justifying a lawful warrantless search, or circumstances justifying a lawful warrantless arrest, (2) the evidence in itself or in itself with facts known to the officer prior to the search, but without the necessity of subsequent development of additional facts, provides a connection between the evidence and criminal activity, (3) the evidence is discovered in the physical area properly searchable within the purposes for which the search was initiated, and (4) the evidence is discovered while the officer is actually searching for objects within the purpose for which the search was initiated.

Requirement (1) of this rule insists only upon a lawful entry. In *Marron, Aron* and *Eisner* the lawful entry was provided by a search warrant; in *Hayden* by hot pursuit; and in *Harris* by an arrest warrant. No reason appears for placing other lawful means of entry on a different plane.

Requirement (2) is designed to permit seizure of objects, the very possession of which is illegal, so that it can be said that by mere possession the possessor is committing a crime in the presence of the officer, as in *Harris* (draft cards), *Aron* (stolen postage stamps), and *Eisner* (stolen furs)[10] and objects which in

9. *Harris* has been restricted by Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) but only in outlining the physical area which may be searched.

10. I confess doubt of the propriety of the decisions in *Aron* and *Eisner*. Possession of stolen items is indeed illegal, but in the absence of facts, known to the officer before he seizes the objects, which label the items as stolen, the propriety of the seizure is dependent upon later development of facts. Permitting seizure of items which may turn out to have been stolen has a dangerous tendency to permit seizure of anything on whatever pretext and letting officers thereafter conduct an investigation to determine whether it has been stolen. I should think requiring evidence *before* the seizure would be much to be preferred. In short, I think that probable cause should exist at the time of the seizure, except for some rare need for temporary seizure, because, if a search warrant were sought at the moment before the seizure, probable cause would be required. No more latitude should be allowed warrantless seizures. The court in United States v. Van Leeuwen, 397 U.S. 249, 90 S.Ct. 1029, 25 L. Ed.2d 282 (1970), while permitting a seizure without probable cause, did so only because of the exigencies arising from the mobility of the packages—they would be moved shortly—and the seizure was only until a warrant could be issued on the basis of probable cause. But to permit seizure—permanent seizure—without probable cause and on mere suspicion that an object is stolen is going too far. A solution in the *Aron* and *Eisner* situations consistent with the *Van Leeuwen* decision could have been achieved by holding the automobile temporarily pending investigation of whether the newly found contents were stolen and, if probable cause to believe so were located shortly, a warrant would issue.

light of information already in the possession of the officer provide a "nexus" between the objects and criminal behavior required by Warden Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

In *Hayden* the nexus between clothing found in a washing machine and criminal behavior came from the fact that "The clothes * * * matched the description of those worn by the robber and the police therefore could reasonably believe that the items would aid in the identification of the culprit." On the other hand, the films seized in Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) could be interpreted as being obscene only as a result of additional developments—viewing them on a projector and screen—so they were not "contraband, criminal activity, or criminal evidence in plain view," according to the concurring opinion of Justices Stewart, Brennan, and White.[11] Perhaps the rational line between the *Hayden* holding and the *Stanley* concurring opinion is the boundary separating facts known *before* and those discovered *after* the discovery of the objects not described in the warrant. Requirement (2) attempts to mark that line.

■ Requirement (2) draws no distinction between fruits of a crime, instrumentalities of a crime, "mere evidence" of a crime, and weapons.

If the language in *Hayden*:

" * * * There must, of course, be a nexus—*automatically provided in the case of fruits, instrumentalities or contraband*—between the item to be seized and criminal behavior * * *." (Italics added.)

It seems to me that a proper application of the *Harris* principle would permit seizure of heroin or similar drugs, reasonably identifiable on the spot by the officer as being illegal drugs, a concealed weapon [see United States v. Valentine, 427 F.2d 1344 (C.A. 8th Cir. 1970)], or liquor by a minor, for example. But as to things which may be stolen—unless obviously stolen and connected with a

means that as to fruits, for example, the officer need not have reason at the time of the seizure to know that they are "fruits" of a particular crime—indeed, need not even know that a crime has been committed—then Requirement (2) is too narrowly drafted. But more likely, the language means that either the items must be themselves declarations of a crime or the officer must have knowledge of the fact of a crime and have some reason, which may be based upon the plain appearance of the items themselves, to believe that the items are fruits. So also with instrumentalities of a crime.

■ Requirements (3) and (4) mean that the scope of the search cannot be expanded by the discovery of evidence relating to a different crime. To broaden the scope—or to institute virtually a new search—requires the obtaining of a new search warrant. This concept may also be incipient in the concurring opinion in *Stanley*. Perhaps a new search, one now directed to the newly discovered crime, takes place when officers can discover the connection between the evidence and criminal behavior only by showing films on a screen or by otherwise developing new facts. Requirement (4) is true to the tone of *Hayden*, wherein the court said:

" * * * But even if we assume, although we do not decide, that the exigent circumstances in this case made lawful a search without warrant only for the suspect or his weapons, it cannot be said on this record that the officer who found the clothes in the washing machine was not searching for weapons * * *"

crime known to the officer before the seizure—I think a magistrate's judgment should be inserted between the officer and the citizen by requiring a warrant issued on probable cause.

11. The majority did not discuss the issue, deciding the case on the issue of constitutionality of Georgia's obscenity statute.

## CONCLUSIONS

 It seems apparent that the burning bar pipe, regulator and gauges, goggles, water hose, drill set, soldering gun and case, water containers, amunition, blasting caps, dynamite and knife fall within the term "burglary tools" and therefore were properly seized. It seems equally clear that the sweat shirts, coins, sales slip, rental agreement, papers, cigarettes, gum, batteries, radio, pen, shoes, socks, gloves, trousers, pants, postage stamps and cardboard cannot be construed to be burglary tools. Whether "miscellaneous tools, wire," "heavy miscellaneous tools," and "miscellaneous hand tools" may be burglary tools depends upon further evidence. The vacuum cleaner bag containing sweepings and debris was particularly described in the warrant and was properly seized.

As to the vacuum cleaner bag containing sweepings and debris and those items set out above as being within the term "burglary tools" the motion to suppress will be denied.

 As to the items listed on Exhibit A of the motion to suppress as "1 pair shoes Exhibit No. 6," "3 revolvers Exhibit No. 3–4–5," "2 carpenter tools Exhibit No. 1–2," "1 money bag Exhibit No. 26," "1 box containing Clarence Byrd clothing," "1 box containing James F. Ward clothing," "1 box containing Joe Mack a/k/a Robert O. McDonnell clothing," "1 box containing foot molds," and "1 box containing assortment tools" there is no way under the evidence of identifying them as having been taken during any search touched upon by the evidence. The inventory of items taken from the car makes no mention of them. Accordingly, as to them, the motion to suppress will be denied.

 As to all objects of which suppression has been requested and which are set out above as not falling within the term "burglary tools" or which are within the three items of "miscellaneous" tools, the issue of suppression must rest upon the application of the requirements of the rule adopted in Section V of this opinion. Such application results in the following: Requirement (1) is met by the issuance of the valid warrant. The evidence is simply silent as to Requirements (2), (3), and (4). In a motion to suppress the burden of proof is on the defendant. Murray v. United States, 333 F.2d 409 (C.A. 10th Cir. 1964), vacated on other grounds, 380 U.S. 527, 85 S.Ct. 1345, 14 L.Ed.2d 266; Batten v. United States, 188 F.2d 75 (C.A. 5th Cir. 1951); United States v. Warrington, 17 F.R.D. 25 (U.S.D.C.Cal.1955); United States v. Okawa, 26 F.R.D. 384 (U.S.D.C.Hawaii 1961). A prima facie carrying of this burden has been met by the defendant's showing that the items were found in the automobile but not particularly described in the warrant. In the absence of responsive evidence by the government that the requirements of the rule adopted by this opinion were met the items must be suppressed, because the government is in a position of having peculiar knowledge of the facts of the search of the automobile and seizure of the items not described in the warrant. In the interests of justice the government should be given every reasonable opportunity to develop those facts.

Therefore, an order will be entered sustaining the motion to suppress as to all the items mentioned in Exhibit A attached to the motion to suppress except:

1 set Victor brand regulator, gauges with red and green hoses containing a torch head and one pair of goggles; 1 7' length of green plastic water hose; 7 five foot length burning bar pipe; 8 five foot length burning bar pipe; 9 five foot length burning bar pipe; 12 five foot length burning bar pipe; 12 five foot length burning bar pipe; 1 five foot length burning bar pipe with threaded adapter; 1⅜ inch Black and Decker drill set; 1 soldering gun set with case; 2 red 5 gallon water containers, plastic; 1 plastic yellow box containing 41 rounds of 38 special ammo.; 1 vacuum cleaner bag con-

taining sweepings and debris; 8 electric blasting caps and two sticks of Atlas brand dynamite; "1 pair shoes Exhibit No. 6"; "3 revolvers Exhibit No. 3–4–5"; "2 carpenter tools Exhibit No. 1–2"; "1 money bag Exhibit No. 26"; and one knife.

but granting the government ten days in which to file a request for rehearing for the purpose only of presenting the facts as to requirements (2), (3), and (4) as to the items suppressed and as to whether "miscellaneous tools, wire," "heavy miscellaneous tools," and "miscellaneous hand tools" may be considered to be burglary tools.

Ruling on the motion for the return of seized property will be reserved, pending complete disposition of the motion to suppress.

An order consistent with this memorandum will be entered this date.